89 N.J. Super. 276 (1965)
214 A.2d 549
IN THE MATTER OF THE ADOPTION OF G.
Superior Court of New Jersey, Monmouth County Court, Probate Division.
Decided October 29, 1965.
*277 Mr. Chester Apy for plaintiffs (Abramoff & Apy, attorneys).
Mr. Charles L. Morgan for Family and Children's Service, Inc.
Mr. Joseph N. Dempsey guardian ad litem for the infant G.
*278 FISHER, J.C.C.
Plaintiffs move to vacate a judgment of adoption entered in the Monmouth County Court on March 12, 1965.
The following narrative recites the facts as the court finds them:
The adoptive parents are fine, upstanding young people of better than average means. On January 22, 1960 this couple adopted twin boys. These youngsters are normal, healthy and active. In 1963 plaintiffs decided to apply to an approved agency for a little girl, and were successful. This baby was born on October 7, 1963 and was surrendered to the approved agency on October 21, 1963. At birth the child was in apparent good condition, but weighed only 5 lbs. 3 ozs. Before the little girl was placed in plaintiffs' home she was regularly examined by a pediatrician. In addition to this, a further examination was made of the child by a psychologist when she was three months old. Plaintiffs obtained the baby on January 21, 1964 and they have had her with them since that date. On the day the baby was accepted she was taken by plaintiffs to a physician for an examination and was seen by the same doctor every month thereafter regularly and between these dates when necessary.
The baby appeared well with the exception that when she became of an age where a normal baby would sit up, she did not. Concerned because of the child's apparently slow development the adoptive mother took the baby back to the doctor in July 1964. X-rays were ordered and found to be normal. Another physician was consulted and he found the baby to be normal except for the slow development.
In January 1965 the child had been in the care of plaintiffs for one year, thus satisfying the statutory requirement. Plaintiffs then filed a complaint for adoption in this court on February 26, 1965. Final hearing took place on March 12, 1965. Plaintiffs were advised at that time of the seriousness of this step and the fact that the infant would be their daughter from that time forward.
*279 After the adoption plaintiffs noticed the continued slow development of the child and were finally referred to Dr. D.M., a specialist and concededly an expert in the field of pediatric neurology. Upon the completion of his examination the doctor confronted plaintiffs with the tragic revelation that the baby was retarded to such an extent that she would eventually require commitment to an institution. With this dilemma facing them, plaintiffs sought the advice of counsel and this motion ensued. By consent of the attorneys Dr. M.'s deposition was taken and that testimony clearly indicates that the child is uneducable and trainable only to a limited extent. The chances of her being an independent individual are sharply limited. Her intellectual ability when she is fully matured will be no greater than 50% of normal and the limit of her self-sufficiency will be walking, feeding, toilet needs and some communication. Dr. M. felt that it would make little difference to this child whether she remained in plaintiffs' home or was placed in an institution.
At the request of and by order of the court a guardian ad litem was appointed for the baby and is serving commendably and without fee.
Testimony was taken in this case on September 24, 1965, at which time plaintiffs were called as witnesses. The court also requested that the director of the approved agency involved be called as a witness. Plaintiffs presented their problem to the court and in so doing were impressive by their candor and fairness. They felt that although the twin sons were bearing up well under this problem, as time went on both the financial burden which would be imposed upon the parents and the time necessary to care for the infant would have an adverse effect on the other children.
The director's testimony consisted chiefly of what would occur should this adoption be vacated. The child would be returned to the custody of the agency and the natural mother would be notified with regard to the future care of the baby. The agency has no facilities to cope with this problem and the *280 State would then become involved as well as the natural mother.
At the outset counsel for the agency took the position that this court has no jurisdiction to vacate a judgment of adoption, pointing out that the intention of the act is well defined in N.J.S.A. 9:3-17, but is completely silent as to any machinery to set aside these judgments. The agency admits, however, that the court would have jurisdiction where fraud is alleged.
The question of jurisdiction has been raised in two reported decisions in our State. In Matter of Adoption of L, 56 N.J. Super. 46 (Cty Ct. 1959), holds only that in view of the facts recited therein the court would not vacate the judgment even if it had jurisdiction, thereby not deciding the issue. The other is In Matter of Adoption of O, 88 N.J. Super. 30 (Cty. Ct. 1965). There the court conducted a full hearing, after which the application to set aside the judgment of adoption was denied. The allegation in that case was fraud. The court did hold, however, that it had jurisdiction.
There can be no question that this court has jurisdiction to entertain the motion. It is a matter of procedure subject to the rule-making power of the Supreme Court. New Jersey Constitution of 1947, Art. VI, § II, par. 3; New Shrewsbury Borough v. Block 115, Lot 4, 74 N.J. Super. 1 (App. Div. 1962); Winberry v. Salisbury, 5 N.J. 240 (1950), certiorari denied 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950).
R.R. 4:62-2 has set forth the circumstances under which any judgment may be vacated, and the matter rests in the sound discretion of the trial court to interfere with a judgment when justice requires. Wilford v. Sigmund Eisner Co., 13 N.J. Super. 27 (App. Div. 1951).
Being unknown at the common law, proceedings to adopt children are by virtue of statute. In re Flasch, 51 N.J. Super. 1 (App. Div. 1958), Stawicky v. Stawicky, 12 N.J. Super. 72 (App. Div. 1951), Gardner v. Hall, 132 N.J. Eq. 64 (Ch. 1942), affirmed 133 N.J. Eq. 287 (E. & A. 1943).
*281 The intention of the Legislature in enacting the adoption statutes, N.J.S.A. 9:3-17 et seq., is not only apparent in the strong statement of policy contained therein but may be drawn from the entire act. The Legislature intended that there be finality in the judgment and that an entire new relationship be effected between the adoptive parents and the child. The act is careful in setting up the procedures leading up to final adoption to insure that when final judgment is entered entirely new relationships are created. The natural mother's rights and her responsibilities to the child are terminated. The new relationship between the adoptive parents and the child is so fixed that there may be no interference from any outside source.
The best interests and welfare of the child should be the paramount consideration of the court in any proceedings involving the status of an adoption. In re Adoption of D, 78 N.J. Super. 117 (Cty. Ct. 1963). However, in the instant case the interests of the child are not affected to any great extent. Her future, as far as may be predicted, is commitment to an institution either immediately or after a short period under the care of the plaintiffs.
Based upon the testimony taken in this case from plaintiffs, the child is loved and well cared for, and the court is irresistibly drawn to the conclusion that these people will do the right thing by their child. Concern for plaintiffs' twin boys cannot be a controlling factor, for the only parties to be considered herein are the adoptive parents and the child. A. v. M., 74 N.J. Super. 104 (Cty. Ct. 1962). The law recognizes no distinction between an adoptive parent and child and a child's relationship to its natural parents.
The motion is accordingly denied.