IN THE INTEREST OF A FEMALE MINOR
CHILD BORN ON AUGUST 26, 1967.

No. 4903.

NOVEMBER 23, 1970.

RICHARDSON, C.J., MARUMOTO, ABE,
LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY MARUMOTO, J.

This case involves a female child born on August 26,
1967. At the time of her birth, her natural parents were

unmarried high school students, both 17 years old, the natural father having been born on March 9, 1950, and the mother on March 18, 1950.

On August 28, 1967, the mother executed her consent to the placement of the child with persons selected by her physician as adoptive parents and to the adoption of the child by such persons.

The physician selected a married couple, both 43 years old, who had one adopted daughter 3 years old, as the adoptive parents and placed the child with them on September 1, 1967.

The adoptive parents so selected filed their petition for the adoption of the child in the family court on November 30, 1967.

On January 12, 1968, the physician instituted a proceeding in the same court to obtain an order (1) confirming the mother's consent to adoption and denying permission for its withdrawal; (2) determining, in the best interests of the child, that the natural father and his parents had no interest in her care, custody, and control and in the pending petition for her adoption; and (3) permitting the petition for adoption to be heard without the intervention of the natural father, his parents, the mother, and her parents. This was done by the filing of a motion for an order to show cause directed to the guardian ad litem of the mother, the parents of the mother, the guardian ad litem of the natural father, and the parents of the natural father.

The physician filed the motion because the natural father had written to him on November 4, 1967, that he and the mother planned to be married and did not want the child to be adopted, and the mother had written to him on November 8, 1967, that she wanted "to withdraw from the adoption" and to have the child placed in the

custody of the parents of the natural father until the natural father and she could be married.

On the motion, the court held extensive hearings at which it heard the testimonies of the attorney who had obtained the mother's consent to adoption, the physician, the mother, her parents, the natural father, his mother, and the social worker of the department of social services who had worked on the case.

From the testimonies, the court found that the only realistic alternatives were adoption by the parents of the natural father and adoption by the adoptive parents selected by the physician; that the latter alternative would serve the best interests of the child; that the mother gave her consent to adoption freely and voluntarily; that permitting the mother to withdraw her consent would not be in the child's best interests; and that the motion filed by the physician should be granted. A decision containing these findings was filed on August 6, 1968, and an order effectuating the findings was entered on August 20, 1968.

However, on August 19, 1968, the day before the entry of the order, the natural parents were married in California, as permitted by the statute of that state. Under the applicable statute of Hawaii, they could not have married until March 18, 1970. HRS § 572-2 requires parental consent to the marriage of a minor. The parents of the natural father were willing to give their consent, but the parents of the mother were unwilling to do so.

On August 20, 1968, the natural parents filed a motion to vacate the order entered on that day, as well as the decision of August 6, 1968, and also to have the child restored to them, on the grounds that they were her natural and legal parents, that the requisite consent to her adoption had not been given, and that her best interests would be served by the restoration.

On this motion, the court again held extensive hearings at which it heard the testimonies of the natural parents, the paternal grandfather, and two psychiatrists. These hearings were held to adduce further evidence regarding the best interests of the child.

On April 22, 1969, the court filed a supplemental decision in which it reiterated the findings set forth in its decision of August 6, 1968, and ruled that the marriage of the natural parents might be a circumstance to be considered in the pending petition for adoption but did not limit its jurisdiction to hear and determine that petition. An order pursuant to the supplemental decision was entered on April 24, 1969. This appeal has been taken by the natural parents from that order.

Four questions have been raised on this appeal: first, whether the marriage of the natural parents made the consent of the natural father a prerequisite to adoption, in addition to the consent of the mother; second, whether the consent of the mother was obtained under duress; third, whether the court erred in its refusal to permit the mother to withdraw her consent; and, fourth, whether the mother was deprived of any constitutional right when portions of the hearings on the motion filed by the physician were held without her personal presence.

Of the questions stated above, the last three do not require extended discussion. The second and the third questions are premised on the findings made by the court upon its evaluation of the evidence before it and the credibility of witnesses. We cannot say that those findings are clearly erroneous. As a matter of fact, the findings are amply supported by the record. With respect to the fourth question, we do not see any constitutional infirmity. On the first two days of the hearings on the physician's motion, held when she was out of this jurisdiction, the mother was represented by her guardian ad litem, who is

a licensed attorney. At all other times, the mother was personally present and was accorded ample opportunity to testify. Her testimony is recorded in 95 pages of the transcript.

The first question would not have arisen if the mother had given her consent to adoption after July 11, 1969, the effective date of S.L.H. 1969, c. 183. S.L.H. 1969, c. 183 amended HRS § 578-2 to provide that consent to adoption is not required of "the natural father of an illegitimate child who has not legally been legitimated either prior to the placement of the child with adoptive parents or prior to the execution of a valid consent by the mother of the child."

S.L.H. 1969, c. 183 is not retroactive. Consequently, the question here must be considered under HRS § 578-2 as it stood before the amendment. Hereafter, in this opinion, any reference to HRS § 578-2 will be to that statutory provision before the amendment.

HRS § 578-2 provided that "in all cases of adoption written consent shall be given by each of the living legal parents"; that any parental consent "shall be valid and binding even though it does not designate any specific adoptive parent or parents, if it clearly authorizes * * * some proper person not forbidden by law to place a child for adoption, to select and approve an adoptive parent or adoptive parents for the child"; and that such consent "may not be withdrawn or repudiated after the child has been placed for adoption, without the express approval of the judge based upon a written finding that such action will be for the best interests of the child."

Relevant to HRS § 578-2 is HRS § 338-21, which provides: "All children born out of wedlock * * * become legitimate on the marriage of the parents with each other and are entitled to the same rights as those born in wedlock * * *."

Although HRS § 338-21 is presently a part of the chapter on vital statistics, the quoted portion is a substantive provision governing legitimation, and has been in effect since 1866. Laws of 1866-67, Act of May 24, 1866.

A literal reading of HRS § 578-2 with HRS § 338-21 would require the natural father's consent after his marriage to the mother because by that marriage the natural father became a "legal parent". But statutes are not always literally construed. *Yoshizaki* v. *Hilo Hospital,* 50 Haw. 150, 153, 433 P.2d 220, 222 (1967); *Appeal of Chung,* 44 Haw. 220, 228, 352 P.2d 846, 850 (1960); *Chang* v. *Meagher,* 40 Haw. 96, 102 (1953); *Rathburn* v. *Kaio,* 23 Haw. 541, 544 (1916); *Holy Trinity Church* v. *United States,* 143 U.S. 457, 459 (1892); *National Woodwork Manufacturers Ass'n* v. *National Labor Relations Board,* 386 U.S. 612, 619 (1967).

In *Holy Trinity Church* v. *United States, supra,* the court stated: "It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."

The principle stated in *Holy Trinity Church* v. *United States* is referred to with approval in *National Woodwork Manufacturers Ass'n* v. *National Labor Relations Board, supra.* This court also referred to that case in *Chang* v.

*Meagher, supra,* and stated: "While the most desirable construction of a statute is that which is consistent with the spirit and letter thereof, both of which should be considered, frequently the purpose of an Act justifies the departure from a literal construction of the wording."

Earlier, this court stated in *Rathburn* v. *Kaio, supra,* that "if following the strict letter of a statute will lead to palpable injustice the courts search for a more reasonable meaning of the language which will also accord with the spirit of the enactment." A recent pronouncement of this court on the subject is in *Yoshizaki* v. *Hilo Hospital, supra,* where it is stated: "We are aware of the many canons of construction which are supposed to aid a court in construing a statute. But we are also aware that for every construction exhorting a court to a literal interpretation of a statute there is a contrary one which justifies construction in a more liberal manner. A statute must be interpreted with a view to the problems with which it is intended to deal and not by reference to the too often vague concept of legislative intent."

In construing a statutory provision similar to HRS § 578-2, courts are divided as to whether the consent of the natural father should be required when he marries the mother.

The following are some of the cases which have construed the statute literally and required the natural father's consent: *Warner* v. *Ward,* 401 S.W.2d 62 (Ky. 1966) ; *Sklaroff* v. *Stevens,* 84 R.I. 1, 120 A.2d 694 (1956) ; *Harmon* v. *D'Adamo,* 195 Va. 125, 77 S.E.2d 318 (1953), and *In re Adoption of Doe,* 231 N.C. 1, 56 S.E.2d 8 (1949).

Among the cases which have construed the statute liberally in the light of the problem intended to be dealt with are: *In re T.,* 95 N.J. Super. 228, 230 A.2d 526 (1967) ; *In re Laws' Adoption,* 201 Cal. App. 2d 494, 20 Cal. Rptr. 64 (1962) ; *In re Adoption of a Minor,* 338 Mass.

635, 156 N.E.2d 801 (1959) ; *In re Adoption of Morrison,* 260 Wis. 50, 49 N.W. 2d 759 (1951) ; *In re Simaner's Petition,* 16 Ill. App. 2d 48, 147 N.E.2d 419 (1957).

The family court followed the latter group of cases and rightly so, in our opinion.

The rationale of the cases which have construed the statute liberally is best stated in *In re T., supra,* as follows : "It should be observed that plaintiffs were not married when the preliminary hearing approving defendant's placement of the child was held in June 1965. This was the critical point in the entire sequence of events. Since the child had no legitimate father at that point in time, the subsequent marriage did not have the retroactive effect of making consent essential. To hold otherwise would run contrary to the policy manifest throughout the Adoption Act."

Another statement of the rationale appears in *In re Adoption of a Minor, supra,* where it is stated : "At the time the mother's consent was given she alone had authority to speak for the natural parents * * *, and did so. The father's consent then was not necessary. * * * Her consent, conclusive when given, should be treated as binding on him as the other natural parent. Permission to withdraw that consent should be given by the probate judge only when the best interests of the child so dictate."

*In re Adoption of a Minor* was referred to in *In re Laws' Adoption, supra,* where the court stated : "In effect, during illegitimacy, the natural mother acts in her own behalf and as the father's agent in all matters affecting the child. Her agency is implied in law and extends to the transfer or renunciation of parental rights on his behalf as well as her own."

The provision of HRS § 578-2 that "consent to adoption * * * may not be withdrawn or repudiated after the child has been placed for adoption, without the approval

of the judge based upon a written finding that such action will be for the best interests of the child," manifested the policy on adoption in this state that the crucial date for parental consent was the date on which the child was placed for adoption.

In the light of such policy, the words "legal parents", as used in HRS § 578-2, should be construed to mean persons who were legal parents at the time of placement of the child for adoption. To render such construction is within the legitimate functions of the judiciary, one of which is to fill a gap in the statute. *Hayes* v. *Gill*, 52 Haw. 251, 254, 473 P.2d 872, 875 (1970). A time limit beyond which a parent may not freely upset an adoption is essential to the integrity of the adoption process.

Affirmed.

*Richard D. Welsh* (*David N. Ingman* with him on the brief) for appellants.

*Harold W. Nickelsen* (*Anthony B. Craven* on the brief, *Henshaw, Conroy & Hamilton* of counsel) for appellee.

---

DISSENTING OPINION OF ABE, J.

The majority of the court holds that upon the marriage of the natural parents a child born out of wedlock becomes legitimate and is entitled to the same rights as those born in wedlock under the provisions of HRS § 338-21; however, the consent of the father is not required where the mother had previous to the marriage given her consent to the child's adoption. I disagree.

HRS § 338-21 reads:

"Legitimation. (a) *All children born out of wedlock, irrespective of the marriage of either parent to another, become legitimate on the marriage of the parents with each other and are entitled to the same rights*

404

*as those born in wedlock and shall take their father's name as a family name.* The child or children or the parents thereof may petition the department of health to issue a new certificate of birth in the new name of the legitimated child, and the department shall issue the new certificate of birth upon being satisfied that the child or children has or have been legitimated." (Emphasis added)

The emphasized portion of the section is unequivocal and, upon the marriage of her natural parents, the child became legitimate for all intents and purposes as though she was born in wedlock as of the date of her birth.

The pertinent portion of HRS § 578-2[1] reads:

"Consent to adoption. * * * in all cases of adoption written consent shall be given by each of the living legal parents * * * provided, that no hearing upon a petition for adoption, where the written consent of each of the living legal parents has not been obtained, shall be had until such nonconsenting parents have had due notice, actual or constructive, as hereinafter provided, of the time and place of hearing; * * *."

The statute is crystal clear in requiring the consent

---

[1] This section was amended by Act 183, SLH 1969, and became effective on July 11, 1969, and is not applicable here. The pertinent portion of § 578-2 as amended reads:

"§ 578-2. Consent to adoption. (a) Persons required to consent to adoption. Unless consent is not required under paragraph (b) hereof, a petition to adopt a child may be granted only if written consent to the proposed adoption has been executed by:

(1) Each living parent of a legitimate child;
(2) The mother of an illegitimate child;
*       *       *       *       *

(b) Persons as to whom consent not required. Consent to adoption is not required of:
*       *       *       *       *

(3) The natural father of an illegitimate child who has not legally been legitimated either prior to the placement of the child with adoptive parents or prior to the execution of a valid consent by the mother of the child;
*       *       *       *       *"

of both legal parents to the adoption of a child. Thus, after the marriage, Richard Doe became the legal father of the child and therefore under the statute his consent is necessary to the adoption. Courts of other jurisdictions also have so interpreted similar statutes. *Warner* v. *Ward,* 401 S.W.2d 62 (Ky. 1966); *Sklaroff* v. *Stevens,* 84 R.I. 1, 120 A.2d 694 (1956).

This court says the question "whether the marriage of the natural parents made the consent of the natural father a prerequisite to adoption, in addition to the consent of the mother", would not have arisen if this case were to be decided under HRS § 578-2, as amended by SLH 1969, c. 183, and I agree.

Also, this court says "A literal reading of HRS § 578-2 with HRS § 338-21 would require the natural father's consent after his marriage to the mother because by that marriage the natural father became a 'legal parent.'" However, it then holds that the statutes should not be so construed in this case but only to require the signature of the legal parent or parents, who occupied such status at the time the child was placed for adoption.

The legal effect of this court's interpretation of HRS § 578-2 is to make the enactment of the amendment useless, because by its interpretation this court accomplishes the very thing the legislature intended to do by the amendment. It appears to me that this court is saying that the legislature didn't know what it was doing—enacting an unnecessary amendment. In my opinion, in light of the legislative enactment of the amendment, this court is usurping legislative power and entering the legislative field under the guise "to fill a gap in the statute."

It should be noted that this court said in *Levy* v. *Kimball,* 51 Haw. 540, 545, 465 P.2d 580 (1970):

"In the construction of a statute the general law is that a statute should be so interpreted to give it effect;

and we must start with the presumption that our legislature intended to enact an effective law, and it is not to be presumed that legislation is in vain effort, or a nullity. *In re Pringle,* 22 Haw. 557, 564 (1915) ; *Pliakos v. Illinois Liquor Control Commission,* 11 Ill. 2d 456, 143 N.E.2d 47 (1957) ; *Peterson v. Flood,* 84 Ariz. 256, 326 P.2d 845 (1958) ; *Combs v. Cook,* 238 Ind. 392, 151 N.E.2d 144 (1958)."

However, here, this court by its construction makes the amendment to the statute a nullity.

Now, for the purpose of argument, assuming that HRS § 578-2 is ambiguous as this court seems to hold, wasn't the family court and isn't this court now required to construe HRS § 578-2 in the light of the provisions of HRS § 571-1? HRS § 571-1 provides that "families whose unity or well being is threatened shall be assisted and protected, and restored if possible as secure units of law abiding members; and that each child and minor coming within the jurisdiction of the court shall receive, preferably in his own home, the care, guidance, and control that will conduce to his welfare * * *."

HRS § 571-1 proclaims the public policy of this jurisdiction for the maintenance of a family unit. I believe this policy is applicable to adoption and thereby adoption is made subordinate to this basic policy. It would appear to me that HRS §§ 571-1 and 578-2 are definitely in pari materia. Thus, where a legal father has withheld his consent to the adoption, HRS § 578-2 should be so construed to permit him to retain the child.

In my opinion, this court's construction of HRS § 578-2 is an absolute contradiction of its rule of construction enunciated in *In Re Application of Robinson,* 51 Haw. 164, 168, 454 P.2d 116 (1969), where it said:

"Laws in pari materia are construed together. HRS § 1-16 provides: '* * * Laws in pari materia, or upon

the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another.' "

This court, by its decision, adopts a mistaken notion of the family court that the primary policy of this State is to favor the adoption of a child over the maintenance of a family unit and thereby approves the disruption and destruction of the unity and well being of a family unit.

Before concluding, may I also point out the weaknesses of the cases cited by this court in support of its proposition:

*In Re T.,* 95 N.J. Super. 228, 230 A.2d 526 (1967), the Superior Court, Appellate Division of the State of New Jersey, I believe should have disposed of the case on the doctrine of res judicata. It involved an appeal from judgment entered in a second proceeding brought by natural parents of a child born out of wedlock, who had married subsequent to the birth of the child. The issues involved in the second proceeding were the same as those involved in and adjudicated in the first proceeding.[2] In the first proceeding, judgment was entered against the parents. However, they failed to perfect an appeal within the required period and after they had failed in their attempt to enlarge the period of appeal, they filed the second proceeding. In the meantime, adoption proceeding had been culminated.

---

[2] The court recognized the issue of res judicata as it noted:

"He argued that the Chancery Division *habeas corpus* proceedings were not *res judicata* because the issue of what was in the best interests of the child had not been litigated. (We observe that the complaint in those proceedings did speak of the best interests of the child being served by permitting it to live with its parents.) The argument was also advanced that although the father had not given his consent at the time child was surrendered to the agency, the intervening marriage retroactively gave him such status as to require his consent to any surrender of the child for placement in an adoptive home. Plaintiff's counsel once again raised the issue of duress. contending that the mother's circumstances had been such that she did not surrender the child of her free will." *In Re T., supra* at 529.

Also the New Jersey court in construing N.J.S.A. 9:15-1,[3] similar to HRS § 338-21, at page 530 said the statute:

> "provides that any child born out of wedlock is legitimated by the intermarriage of his natural parents and their recognition and treatment of him as their child. This statute does no more than entitle such child to all the rights and privileges it would have enjoyed had it been born after marriage."

I cannot agree with the New Jersey court,[4] and I hope this court is not agreeing with the New Jersey court that HRS § 338-21 "does no more than entitle such child to all the rights and privileges it would have enjoyed had it been born after marriage." What about the father's reciprocal rights—the right to love the child, including the right to custody and to nurture and educate the child—also the right of both the child and father to inherit from each other?

In the next two cases cited by this court, *In re Adoption of a Minor*, 338 Mass. 635, 156 N.E.2d 801 (1959) and *In re Laws' Adoption*, 201 Cal. App. 2d 494, 20 Cal. Rptr. 64 (1962), the courts attempt to justify the non-requirement of the father's consent on the basis that the consent of the mother given prior to their marriage was binding on herself as well as the father.

---

[3] N.J.S.A. § 9:15-1 provides:

"Marriage of natural parents. Any child heretofore or hereafter born out of wedlock shall be legitimated by the intermarriage of his natural parents and their recognition and treatment of him as their child. A child so legitimated is entitled to all rights and privileges which he would have enjoyed had he been born after the marriage, his status being the same as if he were born in lawful wedlock."

[4] The same New Jersey court in *In re Adoption of Children*, 96 N.J. Super. 415, 233 A.2d 188 (1967), recognized at page 192 that "[t]he welfare of a child is inextricably bound up with the rights of the parents." Isn't the New Jersey court indirectly refuting its previous holding in *In Re T.*?

Is this court by implication adopting the proposition enunciated by the courts in those two cases? It is the established law of this jurisdiction that a spouse may not bind the other spouse without authority to do so. *Borba v. Leal,* 22 Haw. 1 (1914); *Wilcox v. Hartman,* 17 Haw. 481 (1906). Thus, under the authority of the Hawaii cases, I cannot see any justification to hold that a consent signed by the mother of a child born out of wedlock is binding upon the father. Also it should be noted that at the time she executed the consent he was not her husband. Further, here, on the part of the father, from the outset there was clear indication not only that he did not acquiesce to the consent but also did claim the right to custody of the child in direct opposition to the adoption.

In my opinion the rulings of the cases cited by this court are based on foundation as solid as quicksand and therefore should be disregarded.

I would reverse.